**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                             )

**Richard H. Goldstein,**          )
                             )
   **Plaintiff,**              )
                             )
        **v.**               )     **Civil No. 14-cv-02189 (APM)**
                             )
**Treasury Inspector General for**   )
**Tax Administration,**         )
                             )
   **Defendant.**           )
_____ )

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I.    INTRODUCTION**

In this companion case to *Goldstein v. Internal Revenue Service*, 14-cv-02186-APM (D.D.C. Mar. 25, 2016), Plaintiff Richard H. Goldstein seeks to compel Defendant Treasury Inspector General for Tax Administration (TIGTA) to disclose records collected and created during a TIGTA investigation of certain Internal Revenue Service (IRS) employees.  TIGTA, which is, like the IRS, a component of the Department of the Treasury, located 457 pages of documents responsive to Plaintiff's request, but invoked various statutory exemptions under the Freedom of Information Act (FOIA) to withhold production of those documents.  This opinion addresses the propriety of TIGTA's invocation of those exemptions.

The court concludes that, as a general matter, TIGTA properly invoked FOIA Exemption 6, 5 U.S.C. § 552(b)(6), to withhold most parts of the records responsive to Plaintiff's request.  However, based on the declarations presented by TIGTA, including one submitted *in camera*, the court is not satisfied that the agency has carried out its obligation under FOIA to

segregate non-exempt portions of those records. For that reason, the court will grant in part and deny in part TIGTA's motion for summary judgment and remand this matter to the agency for further consideration of its segregability obligations under FOIA.

## II.    BACKGROUND

### A.    Factual History

The court presumes the parties' (and the reader's) knowledge of the facts as set forth in the companion opinion to this matter, *Goldstein v. Internal Revenue Service*, 14-cv-02186-APM (D.D.C. Mar. 25, 2016). The court therefore does not repeat those facts here and focuses only on those details relevant to resolving the issues in this case.

#### 1.    *Plaintiff's Disclosure of Suspected Criminal Conduct to the IRS*

Plaintiff is an heir to his father's estate. Am. Compl., ECF No. 12, ¶ 7. After his father's death, Plaintiff came to suspect that his father's lawyer, Albert Rose; his sister, Carol Jones; and others had illegally conspired to make various fraudulent transfers designed to avoid paying taxes on $4.6 million in capital gains that, in truth, belonged to the estate. *Id.* ¶ 10; Decl. of T. Scott Tufts, ECF No. 25-1 [hereinafter Tufts Decl.], ¶ 23. The details of the alleged tax avoidance scam matter little for present purposes. What is more important is that Plaintiff believed the arrangement to be unlawful.

Armed with that belief, in or about 2006, Plaintiff directed his lawyer, David Capes, to disclose the supposed fraudulent transfers to the IRS. *Id.* ¶ 11; Tufts Decl. ¶ 24. Plaintiff understood from Capes that Capes had reported Plaintiff's suspicions directly to the Criminal Investigations Division of the IRS located in St. Louis, Missouri, and that the IRS employees tasked with investigating the matter were IRS Criminal Tax Counsel, Timothy Driscoll, and Special Agents Scott French and Mark Hammond (IRS Employees). Tufts Decl. ¶ 8-10.

According to Plaintiff, Capes led him to believe that the IRS' inquiry into the fraudulent transfer remained ongoing at least as of December 2009. To support that claim, Plaintiff points to an email that Capes sent to one of Plaintiff's representatives, Jeanine Patrick, on December 15, 2009 (the Patrick Email). *Id.* ¶ 25; *id.*, Ex. 11, ECF No. 25-12. In that email, Capes reminded Patrick of outstanding legal fees Plaintiff owed him and inquired whether payment would be possible before year end. *Id.*, Ex. 11 at 2. Capes also wrote that he had been "informally advised [that the] IRS was pursuing the matters in which [Plaintiff] was interested." *Id.* Capes stated, however, that he could no longer handle the IRS matter because of "the long overdue outstanding account." *Id.* He, therefore, proposed introducing Plaintiff to a lawyer who formerly worked at the IRS who "might be a useful attorney contact" and who might be able to take over his representation. *Id.* at 2-3.

2. *Plaintiff's Inquiries About Capes' Contacts with the IRS*

In July of 2011, two years after receiving the Patrick email, Plaintiff apparently filed an application for a whistleblower award with the IRS. Plaintiff based that application on a "re-submission" of information purportedly made by Capes to the IRS in November of 2008. *Id.*, Ex. 1, ECF No. 25-2, at 1, 2. More than a year later, on August 9, 2012, Robert Gardner, Program Manager of the IRS Whistleblower Office, responded to the award application and advised Plaintiff that he was not eligible for an award because "the information you provided did not result in the collection of any proceeds." *Id.* Plaintiff, through his new counsel, T. Scott Tufts, responded to that notice and asked the Whistleblower Officer to confirm that the IRS had in fact received a submission from Capes in Novembers 2008. Tufts wrote: "[O]ur client remains to this day in the dark as to what was or was not submitted previously by prior counsel[.]" *Id.* at 1.

3

Two months later, Gardner responded to Tufts' follow-on inquiry about Capes' interaction with the IRS and its investigators.  Gardner advised Plaintiff that he had received information, including "additional documentation," from two of the IRS Employees, attorney Driscoll and one of the special agents, which showed that Capes had attended two meetings with the IRS' Criminal Investigation Division (CID).  *Id.*, Ex. 2, ECF No. 25-3, at 2.  Gardner further advised that Capes had not submitted a whistleblower award request, *i.e.*, a Form 211, during either meeting, but that Driscoll had instructed him on how to submit one.  *Id.*  Tufts persisted in seeking more information from Gardner about Capes' meetings with the CID.  Specifically, he wanted to know when and where the meetings had occurred and what, if any, documentation Capes had turned over during those meetings.  *Id.*

In December 2012, Gardner answered those questions.  Tufts Decl. ¶ 9.  He informed Tufts that, based on documents that he had received, Capes' two meetings with the CID had occurred *before* November 2008—on November 5, 2007, and January 8, 2008.  Both occurred at Capes' law office.  *Id.*  At the first meeting, on November 5, 2007, Capes met only with the two special agents, French and Hammond, and Capes shared Plaintiff's concerns about Plaintiff's father's estate.  *Id.* ¶ 10.  Gardner further advised Tufts that the documents showed that Hammond subsequently met with Driscoll and that they decided not to pursue the matter criminally or civilly.  *Id.* ¶ 11.  Hammond had advised Capes of these decisions by telephone.  *Id.*  Capes then requested a second meeting, which occurred on January 8, 2008.  At that meeting, which Driscoll and Hammond attended, Capes asked the CID to reconsider its decision not to pursue the matter criminally, but Driscoll and Hammond made no commitments.  *Id.*  According to Gardner, based on the documents given to him, there was no further contact between Capes and the CID after

4

January 2008.  *Id. See also id.*, Ex. 5, ECF No. 25-6 (email from Tufts to Gardner summarizing "What We Know At this Point").

Gardner's information surprised Plaintiff and his counsel for at least two reasons.  First, the fact that the CID had informed Capes in January 2008 that the CID would not pursue a criminal investigation was inconsistent with Capes' email nearly two years later, in December 2009, in which he advised Plaintiff that the "IRS was pursuing the matters in which [Plaintiff] was interested."  *Id.*, Ex. 11, ECF No. 25-12; *Id.* ¶ 26.  And, second, Tufts had found a memorandum written by one of Plaintiff's former lawyers stating that a "debriefing" session had occurred with the CID in November 2008—not November 2007, as Gardner had informed—and that, during that meeting, Capes had produced a three-ring binder containing documents concerning the alleged fraudulent transfers.  *Id.*, Ex. 5, ECF No. 25-6.  The memorandum also stated—again, contrary to the information that Gardner had supplied—that Driscoll and Hammond were "favorably impressed" with the materials they had received and would present them to the Department of Justice and the U.S. Attorney's Office.  *Id.*  In an email to Gardner, Tufts explained that he was "very concerned that there is no indication of any meeting of any kind in November, 2008, and no indication of any drop off of binders, etc., in the form of any notebook and Transmittal Memorandum.  I appreciate in advance if you can reconcile these statements with what you are seeing."  *Id.*  Gardner responded that he was "frankly disturbed by these revelations" and that he would seek clarification and "[f]urther documentation."  *Id.*, Ex. 6, ECF No. 25-7.

### 3.    CID Investigation

Four months later, Gardner provided additional information to Tufts.  On April 5, 2013, Gardner informed Tufts that he had spoken with one of the IRS Employees, either special agent French or Hammond, who had told him that he would no longer provide Gardner with additional

information.  Nor would the special agent attempt to obtain or release any additional documents about the matter.  Tufts Decl. ¶ 17.  A month later, on May 14, 2013, Gardner phoned Tufts and advised him that the Whistleblower Office had asked TIGTA to "investigate this matter."  *Id.* ¶ 18.  In July 2013, Tufts received confirmation from Gerald Hurry, a TIGTA Assistant Special Agent In Charge working in the Greensboro Group in the Atlanta Field Division, that TIGTA had initiated an investigation based on the complaint filed by the Whistleblower Office.  *Id.* ¶ 19.

### 4.    *Plaintiff's FOIA Requests*

On July 29, 2013, Plaintiff sent a nine-part FOIA request to the IRS (IRS FOIA Request). *Id.* ¶ 20.  That FOIA request is the subject of the companion litigation, *Goldstein v. Internal Revenue Service*, 14-cv-02186-APM (D.D.C. Mar. 25, 2016).  Item number eight of the IRS FOIA Request, generally speaking, sought access to documents relating to Capes' meetings with, and disclosures, to the CID.  Tufts Decl. ¶ 20.  The IRS declined to produce any information responsive to that request.  *Id.* ¶ 47; *id.*, Ex. 16, ECF No. 11-16, at 2-3.  The IRS also rejected Plaintiff's appeal of that decision.  *Id.* ¶ 50.

Undeterred, Plaintiff's counsel then consulted with TIGTA Special Agent Hurry.  On April 18, 2014, Tufts told Hurry that a TIGTA special agent had recently called him regarding the investigation.  *Id.*, Ex. 21, ECF No. 25-22, at 2.  Tufts also advised Hurry that he remained interested in obtaining the "ledger information" that Gardner had relied upon to tell him about the timing of Capes' contacts with the CID.  *Id.*  Hurry confirmed via email that TIGTA had initiated an investigation of IRS attorney Driscoll "who [had] met with Mr. Capes" and "the special agents." *Id.*  He also suggested to Tufts that he make a request for the ledger "from the IRS Whistleblower's office where Mr. Gardner had previously worked."  *Id.*

Then, on May 28, 2014, Tufts submitted a second, separate FOIA request—which is the subject of this action—on Plaintiff's behalf to TIGTA's Office of Chief Counsel Disclosure Branch.  *Id.* ¶ 56; *id.*, Ex. 22, ECF No. 25-23.  His FOIA request sought:

> Any and all information or investigative material that may have come to light as a result of a completed TIGTA investigation(s) regarding attorney Timothy Driscoll, and/or Special Agents, Mark Hammond and/or Scott French and their interactions with attorneys David Capes and/or [another one of Plaintiff's lawyers] from 2006 through 2010 concerning the reporting of potential tax crimes by various individuals and/or firms.

*Id.*, Ex. 22.  TIGTA responded to the FOIA request with a *Glomar* response; that is, it responded that it could neither admit nor deny the existence of responsive records concerning those third parties.  *Id.*, Ex. 25, ECF No. 25-26.  The agency also referenced FOIA Exemptions 6 and 7(C), asserting that "[y]our request seeks access to the types of documents for which there is no public interest that outweighs the privacy interests established and protected by FOIA."  *Id.*  On appeal, TIGTA affirmed its *Glomar* response.  *Id.* Ex. 28, ECF No. 25-29.

### B.    Procedural History

On December 23, 2014, Plaintiff filed this action, along with the suit in *Goldstein v. Internal Revenue Service*.  *See generally* Compl., ECF No. 1.  He then filed an Amended Complaint on March 4, 2015.  *See generally* Am. Compl.  The Amended Complaint asserted two causes of action arising from TIGTA's refusal to disclose the requested records:  (1) one under the Privacy Act, 5 U.S.C. § 552a (Count One), and (2) another under FOIA, 5 U.S.C. § 552 (Count Two).

In its Answer, TIGTA made a surprising concession—it disavowed its *Glomar* response. Am. Answer, ECF No. 16, ¶ 5 (admitting that TIGTA [had] "conducted investigations pertaining to communications a counsel for the Plaintiff had with Internal Revenue Service personnel"). According to TIGTA, after Plaintiff filed his lawsuit, the agency's Office of Chief Counsel learned

that Special Agent Hurry had disclosed TIGTA's investigation of IRS personnel to Tufts and had advised Tufts that he could make a FOIA request for information about the investigations.  Decl. of Elissa M. Sissman, ECF No. 19-8 [hereinafter Sissman Decl.], ¶ 8.  TIGTA, therefore, concluded that it could no longer "[take] the position that it can neither admit nor deny the existence of any records responsive to plaintiff's request."  *Id.* ¶ 9.

TIGTA then filed its Motion for Summary Judgment on May 1, 2015.  TIGTA's Mot. to Dismiss and Mot. for Summ. J., ECF No. 19 [hereinafter Def.'s Mot.].  The Motion disclosed that, after conducting a search for records, TIGTA had located 457 pages of responsive documents.  *Id.* at 2.  These pages constituted "case files that were created once one or more investigations had been entered into" TIGTA's case tracking system, the Performance and Results Information Systems ("PARIS").  Sissman Decl. ¶ 10.  Even though it had renounced its *Glomar* response, TIGTA nevertheless asserted that it properly could withhold from Plaintiff all 457 pages under FOIA Exemptions 6 and 7(C).  Def.'s Mot. at 8-15.  TIGTA also asserted that 68 of the 457 pages could be withheld for another reason:  they comprised confidential taxpayer information exempt from disclosure under FOIA Exemption 3 in conjunction with 26 U.S.C. § 6103.  *Id.* at 15-16.  Moreover, TIGTA claimed that an additional 62 pages and 48 pages were not subject to disclosure under the deliberative process and attorney-client privileges, respectively, under FOIA Exemption 5.  *Id.* at 17-19.  Finally, TIGTA argued that it had conducted a reasonable search for responsive records, *id.* at 6-8, and that Plaintiff had failed to state a claim under the Privacy Act, *id.* at 3-5.  With leave of court, TIGTA filed an *in camera* legal memorandum and declaration to support its exemption invocations.  *See* Minute Order, March 3, 2016; *see also* Notice of Compliance, ECF No. 34.

Plaintiff filed his own Cross-Motion for Summary Judgment on June 23, 2015.  Pl.'s Cross-Motion for Summ. J., ECF No. 23; Pl.'s *Corrected* Memo. of P&A, ECF No. 27 [hereinafter Pl.'s Mot.].   In addition, because TIGTA defended its asserted FOIA exemptions only through declarations submitted by its employees, Plaintiff also filed a motion seeking to compel TIGTA to produce a *Vaughn* index, which would allow "Plaintiff the opportunity to more adequately oppose and brief the purported claims of exemption and justification for those claims." Pl.'s Mot. for *Vaughn* Index, ECF No. 24, ¶ 27.  The parties' motions are now ripe for consideration.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   To make this determination, the court must "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citations and internal quotation marks omitted). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A non-material factual dispute cannot prevent the court from granting summary judgment.  *Id.* at 249.

Most FOIA cases are appropriately decided on motions for summary judgment.  *See Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  A court may award summary judgment in a FOIA case by relying on the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted), and if they describe "the documents and the justifications for nondisclosure with reasonably

specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

The agency bears the burden of demonstrating that each FOIA exemption applies, and its determinations are subject to a *de novo* review in District Court.  *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  To prevail on a motion for summary judgment, the agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).

## IV.   DISCUSSION

### A.   FOIA Exemptions

The court begins by analyzing TIGTA's assertion that it is entitled to withhold the 457 responsive pages in full under FOIA Exemptions 6 and 7(C).  Exemption 6 provides that "FOIA does not apply to . . . (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  Exemption 7(C) removes from FOIA's purview "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).  Interpreting the plain text of FOIA, the Supreme Court has commented that

> Exemption 7(C) is more protective of privacy than Exemption 6:  The former provision applies to any disclosure that "could reasonably be expected to constitute" an invasion of privacy that is "unwarranted," while the latter bars any

disclosure that "would constitute" an invasion of privacy that is "clearly unwarranted."

*U.S. Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 497 n.6 (1994). Because

Exemption 7(C) "establishes a lower bar for withholding material," *Am. Civil Liberties Union v.*

*DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011), courts in this jurisdiction often analyze Exemption 7(C)

before considering Exemption 6, *see Cause of Action v. TIGTA*, 70 F. Supp. 3d 45, 55 (D.D.C.

2014); *Citizens for Responsibility and Ethics in Washington v. DOJ*, 978 F. Supp. 2d 1, 7 (D.D.C.

2013). The reason for that approach is simple: if Exemption (7)(C)'s lower bar applies, there is

no need for additional analysis. *See id.* For that reason, the court turns first to TIGTA's invocation

of Exemption 7(C) to withhold all responsive records.

### 1. Exemption 7(C)

An essential requirement of Exemption 7(C) is that the information the agency seeks to

withhold must have been "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(C).

In *Kimberlin v. DOJ*, 139 F.3d 944 (D.C. Cir. 1998), the Court of Appeals explained when

Exemption 7(C) protects from disclosure information generated as part of an agency's

investigation of one of its employees. "An agency's investigation of its own employees is for 'law

enforcement purposes . . . if it focuses 'directly on specifically alleged illegal acts, illegal acts of

particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Id.*

at 947 (citing *Sterns v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984)). On the other hand, Exemption 7(C)

does not exempt from disclosure "[i]nternal agency investigations . . . in which an agency, acting

as the employer, simply supervises its own employees." *Id.* at 947 (citing *Sterns*, 737 F.2d at 89).

"Material compiled in the course of such internal agency monitoring does not come within

Exemption 7(C) even though it might reveal evidence that later could give rise to a law

enforcement investigation." *Id.* (citing *Sterns*, 737 F.2d at 89). Additionally, the Court of Appeals

observed, information developed in an investigation "aiming generally … to insure that [the agency's] employees are acting in accordance with statutory mandate and the agency's own regulations" is not information exempt from disclosure under 7(C). *Id.*

Based on the evidence presented by TIGTA, the court cannot conclude, consistent with its obligation to conduct a *de novo* review, that the 457 pages in question were "compiled for law enforcement purposes."[1]   The sum total of the evidence presented by TIGTA to support its assertion that the records were compiled for law enforcement purposes appears in two sentences of the Sissman Declaration, in which she asserts:

> All of the documents responsive to plaintiff's FOIA request were generated or compiled by TIGTA's Office of Investigations in connection with its investigations of individual(s) other than plaintiff.  Therefore, TIGTA has determined that all of the information responsive to plaintiff's FOIA request was compiled for law enforcement purposes.

Sissman Decl. ¶ 12.  Such a conclusory statement tells the court nothing about the nature or purpose of the investigation.  Nor does it enable the court to discern whether the alleged conduct, if proven true, would result in criminal or civil liability.

TIGTA's *in camera* declaration likewise provides no support for its position.  The *in camera* declaration provides some gloss on the types of documents contained among the 457 pages.  *See In Camera* Decl., ¶ 6.  But like the public Sissman declaration, the *in camera* declaration offers no insight into the alleged misconduct of the investigated employees; the laws, regulations, or agency rules the employees were suspected of violating; or the sanctions that might result, if proven, from an alleged violation.

---

[1] This case differs from *Cause of Action*, in which the plaintiff did not dispute that the records sought related to TIGTA's law enforcement functions.  *See* 70 F. Supp. 3d at 55.  Here, Plaintiff expressly challenged such characterization.  *See* Pl.'s Mot. at 20 (arguing that "Defendant TIGTA knows [ ] that its so-called investigation was not one that pertained to a criminal law enforcement matter"); *id.* at 21 (challenging Sissman's assertion that the responsive documents were compiled for law enforcement purposes).

Nor can the court assume from the mere fact that the documents at issue were maintained by TIGTA's Office of Investigation, Sissman Decl. ¶ 5, that the responsive documents were compiled for law enforcement purposes. Admittedly, one court has found that "TIGTA's primary function is law enforcement." *Smith v. TIGTA*, Civil No. JKB-11-2033, 2011 WL 6026040, at *2 (D. Md. Dec. 1, 2011) (citing *United States v. Smith*, 235 F. Supp. 2d 418, 422 (E.D. Pa. 2002) ("TIGTA is a federal law enforcement agency charged with investigating and seeking prosecution of IRS employees who commit federal crimes.")). Yet, TIGTA's own website states that the Office of Investigations' authority "includes investigating allegations of criminal violations *and* administrative misconduct by IRS employees."[2] (emphasis added). The court understands "administrative misconduct" to mean violations of workplace rules that might not give rise to criminal or civil liability, but might lead to workplace discipline. As discussed, TIGTA has not offered any concrete evidence that would allow the court to conclude that the investigation and the responsive material it generated pertained to its law enforcement function, as opposed to its function of investigating "administrative misconduct." Thus, the court concludes that TIGTA has failed to carry its burden of showing that Exemption 7(C) protects the 457 pages of responsive documents from disclosure.

### 2.    *Exemption 6*

The court turns next to TIGTA's invocation of Exemption 6. That exemption, as noted, protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Plaintiff does not contest Defendant's assertion that the responsive records qualify as "similar files" under Exemption 6. *See* Pl.'s Mot. 7-14; *see U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599-603

---

[2] *Investigations*, TREASURY INSPECTOR GEN. FOR TAX ADMIN., https://www.treasury.gov/tigta/oi.shtml (last visited Mar. 25, 2016).

(holding that the term "similar files" should be interpreted broadly and includes information that "applies to a particular individual").  Nor does he challenge that the investigated employees have a substantial personal privacy interest in the records.  *See* Pl.'s Mot. 7-14; *see also Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1228-29 (D.C. Cir. 2008) ("A substantial privacy interest is anything greater than a *de minimis* privacy interest."); *Beck v. DOJ*, 997 F.2d 1489, 1494 (D.C. Cir. 1993) ("A government employee has at least some privacy interest in his own employment records, an interest that extends to 'not having it known whether those records contain or do not contain' information on wrongdoing, whether that information is favorable or not.") (citation omitted). Rather, Plaintiff focuses his response exclusively on the assertion that the public interest in the disclosure of the records outweighs the employees' substantial privacy interests and, therefore, disclosure would not "constitute a clearly unwarranted invasion of personal privacy."  Pl.'s Mot. at 7-14; *see U.S. Dep't of Defense*, 510 U.S. at 495 (noting that when evaluating whether an invasion of privacy is "unwarranted" under Exemption 6, "a court must balance the public interest in disclosure against the interest Congress intended the [e]xemption to protect") (citation and internal quotation marks omitted); *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1125 (D.C. Cir. 2004) (noting that "[t]his court has deemed the privacy inquiry of Exemptions 6 and 7(c) to be essentially the same," but acknowledging that in *Nat'l Archives and Records v. Favish*, 541 U.S. 157, 172 (2004), the court found the purview of Exemption 7(C) to be broader than that of Exemption 6).

The public interest that courts may legitimately balance against an individual's privacy interest is well defined.  "[T]he only relevant 'public interest in disclosure' to be weighed . . .  is the extent to which disclosure would serve the 'core purposes of the FOIA,' which is contribut[ing] significantly to public understanding *of the operations or activities of the government*."  *U.S. Dep't*

*of Defense*, 510 U.S. at 495 (citation omitted).  In other words, "the only relevant public interest" is "the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Id.* at 497 (citation omitted).  The burden of coming forward with a legitimate public interest falls on the requester.  *See Favish*, 541 U.S. at 172 (stating that "the citizen must show" "a sufficient reason for disclosure" when addressing privacy concerns under Exemption 7(C)); *Smith v. Dep't of Labor*, 798 F. Supp. 2d 274, 285 (D.D.C. 2011) ("The requester has the burden of demonstrating [the] public interest" under Exemption 6.).  Because FOIA's "strong presumption in favor of disclosure," *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), is "at its zenith" when Exemption 6 is invoked, the public interest in disclosure must prevail unless the invasion of privacy is "clearly unwarranted," *Jurewicz v. USDA*, 741 F.3d 1332, (D.C. Cir. 2014) (citing *Ray*, 502 U.S. at 177, and *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002)).

The public interest that Plaintiff advances in this case is muddled.  A common thread that runs throughout his briefing is that he personally has "substantial privacy interests" as a whistleblower, in particular with respect to the information and documents he directed Capes to turn over to the IRS.  *See, e.g.*, Pl.'s Mot. at 8 (arguing that "whistleblowers have substantial privacy interests that protect the information they provide to governmental agencies"); *id.* at 8-11 (citing as grounds for disclosure the "whistleblower['s] substantial privacy interest"); *id.* at 15-16 (invoking his "Federally protected whistleblower status"); *id.* at 18 (arguing that TIGTA has frustrated "his" access rights "without regard to his substantial privacy interests").  His *personal* privacy interests as a whistleblower, to the extent he has any, however, neither establishes nor enhances a valid *public* interest to be weighed in Exemption 6 balancing.  *See Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 390 n. 8 (D.C. Cir. 1987) (stating that "the public's interest in

disclosure is neither lessened nor enhanced by the private purpose for which information is sought").

To the extent Plaintiff argues that his mere status as a whistleblower entitles him to the responsive records, irrespective of the Exemption 6 balancing, Pl.'s Reply to Def.'s Resp., ECF No. 32 [hereinafter Pl.'s Reply], Plaintiff has cited no legal authority for that proposition. He cites only to 26 U.S.C. § 7623, Pl.'s Mot. at 9, but that statute only addresses a whistleblower's eligibility to receive an award from the IRS and does not establish a whistleblower's right to access information within an agency's files. Additionally, Plaintiff cites *Ray v. FBI*, 441 F. Supp. 2d 27 (D.D.C. 2006), and *Menchu v. U.S. Dep't of Health and Human Servs.*, 965 F. Supp. 2d 1238 (D. Or. 2013), *see* Pl.'s Reply at 6-8, but both cases are inapposite. *Ray* concerned a confidential informant's request for information concerning his activities as an FBI informant, which the court ordered the agency to produce under FOIA. *Ray*, 441 F. Supp. 2d at 36. It did not address a whistleblower's right to materials generated as a result of a whistleblower's activities and pertaining to third parties. Indeed, in *Ray*, the court expressly held that the informant's status did not entitle him to law enforcement records that implicated the privacy concerns of third parties. *Id.* at 35. *Menchu* does not even address whistleblower rights. Instead, the court in that case addressed whether the plaintiff was entitled, under the Privacy Act, to certain notes taken during the course of an agency's investigation of his alleged discriminatory conduct. 965 F. Supp. 2d at 1238-49. The court held the notes should be disclosed in full because withholding them would deprive the requester of "a right, privilege, or benefit that he would otherwise be entitled by Federal law," namely, the right to be present on his employer's campus and seek employment and medical treatment from his employer, a hospital facility. *Id.* at 1249. Because Plaintiff has not persuaded the court that his supposed whistleblower status affords him any Federal rights, privileges, or

16

benefits that would be deprived upon the nondisclosure of the records he seeks, *Menchu* provides no support for his position.

Alternatively, Plaintiff argues that the public interest in this case rests in the public's right to know how the IRS treats whistleblowers and how the agency's Whistleblower Office is treated by IRS employees.  Pl.'s Mot. at 11 ("Citizens of this country have the right to know what our Government is up [to], when it comes to whistleblowing activities and the manner in which whistleblowers are being treated at the IRS."); *id.* at 19 ("Mindful of the public interest in the treatment of the IRS Whistleblower Office and whistleblowers in general . . . then TIGTA's performance of its official functions is at issue here.").  Such an interest is certainly one to be considered in the Exemption 6 calculus.

Simply alleging the existence of a public interest, however, is not enough to tip the Exemption 6 balancing test in favor of the requester.  "First the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake."  *Favish*, 541 U.S. at 172.  "Second, the citizen must show the information is likely to advance that interest."  *Id.*  Furthermore, as set forth in *Favish*, where, as here,

> the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure.  Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Id.* at 174.[3]  Thus, "courts must insist on a meaningful evidentiary showing" before concluding that the public interest outweighs the private.  *Id.* at 175.

---

[3] *Favish*, of course, was an Exemption 7(C) case, but the court can discern no principled reason why the evidentiary standard articulated there would not apply equally to Exemption 6 cases.

The court has considered the voluminous evidence that Plaintiff has submitted in this case and finds that he has not carried his burden of producing evidence "that would warrant a belief by a reasonable person that alleged Government impropriety might have occurred." *Id.* at 174.  What Plaintiff's evidence shows is that, at most, there remain unanswered questions about when his lawyer, David Capes, met with IRS personnel and what, if anything, his lawyer produced to them. *See* Tufts Decl. ¶ 29.  Additionally, the evidence, if believed, also shows that one of the special agents who met with Capes became less forthcoming after the discrepancy in the meeting dates arose. *Id.* ¶ 17.  Sometime thereafter, TIGTA initiated an investigation.

The foregoing evidence, even taken together, amounts to little more than a "bare suspicion," *Favish*, 541 U.S. at 174, of government wrongdoing.  Indeed, Plaintiff has not even specified which of the three IRS Employees engaged in wrongdoing.  *See* Tufts Decl. ¶ 17 (asserting that "Special Agent French *and/or* Hammond" declined to cooperate further with the Whistleblower Office's inquiries) (emphasis added); *see generally* Tufts Decl. (failing to make any allegations of wrongdoing by IRS attorney Driscoll).  To be certain, the inconsistencies that Plaintiff discovered raise legitimate questions about the extent of Capes' interactions with the IRS and seemingly led TIGTA to conduct an investigation.  But those facts alone would not cause a reasonable person to have more than a suspicion of impropriety by the government.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) (finding under Exemption 7(C) that "bare and undeveloped allegations would not warrant a belief by a reasonable person that impropriety might have occurred").

Moreover, Plaintiff has not shown a likelihood that the documents he seeks would shed light on the asserted public interest in disclosure—the IRS' treatment of whistleblowers and its relationship with its Whistleblower Office.  Indeed, the "nexus" between the "requested documents

and the purported public interest" is unclear.  *Favish*, 541 U.S. at 175.  The records, if disclosed, might help resolve the mystery surrounding Capes' contacts with the IRS—an outcome as to which Plaintiff undoubtedly has a personal interest.  He has not, however, made a meaningful evidentiary showing as to how disclosure of those files would advance the purported public interest of exposing the IRS' mistreatment of whistleblowers and the Whistleblower Office.

Accordingly, the court concludes that the contents of TIGTA's investigative files in this case are exempt from disclosure under Exemption 6.  *Cf. Carter*, 830 F.2d at 390 n. 8 (finding that "the interest of targets of disciplinary investigations in having identifying information redacted clearly outweighs such a generalized public interest in fair and efficient government").[4]

## B.    Segregability

The court views some of Plaintiff's arguments as challenging TIGTA's compliance with its obligation under FOIA to segregate and disclose non-exempt materials.  *See* Pl.'s Mot. at 13 (arguing that "[i]t is of no moment whether or not the information and documentation ended up in the investigatory files of TIGTA"); *id.* at 14 (complaining that TIGTA was "thwarting" his right "to access the documentation and information he supplied to the IRS").  Even if Plaintiff's arguments cannot be so read, the district court must evaluate segregability even if the requester has not challenged it.  *See Sussman,* 494 F.3d at 1116 ("If the district court approves [a] withholding without [ ] a finding [as to segregability], remand is required even if the requester did not raise the issue of segregability before the court.").

Because "the focus of FOIA is information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  FOIA therefore

---

[4] Because the court has concluded that Exemption 6 applies, it does not address TIGTA's invocation of Exemptions 3 and 5, except as discussed below.

requires that "[a]ny reasonably segregable portion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  An agency must provide a "detailed justification" and not just make "conclusory statements" to support its segregability determination. *Mead Data Cent.*, 566 F.2d at 261.  Agencies, however, "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which can be overcome by contrary evidence produced by the requester. *Sussman*, 494 F.3d at 1117.

Here, an attorney within TIGTA's Office of Chief Counsel, Elissa Sissman, declared that the case files responsive to Plaintiff's request contained "information received, collected or generated by TIGTA in connection with its investigations of the subject individual(s)."  Sissman Decl. ¶ 12.  She further asserted that, under Exemption 6, TIGTA had determined that those individuals had a substantial privacy interest in the files and that the "release of the withheld information would shed little, if any light, on TIGTA's performance of its official functions." *Id.* "Accordingly," Sissman concluded, "TIGTA has determined that this information cannot reasonably be segregated for partial release." *Id.*

Notwithstanding the deference owed to an agency's determination of segregability, the court finds the Sissman declaration to be inadequate.  It largely parrots the elements of Exemption 6 and states without "detailed justification" but rather in "conclusory" fashion that no responsive documents are segregable.  That may be so, but the court needs more information before it is satisfied that the agency has carried out its duty.  In particular, the court questions whether the documents that Sissman has identified as "return information . . . of taxpayers other than plaintiff" are reasonably segregable and, therefore, should be produced. *Id.* ¶ 14.  TIGTA is directed to

consider the segregability of those documents in light of the court's rulings in *Goldstein v. Internal Revenue Service*.

### C.   Adequacy of Search

TIGTA also has moved for summary judgment on the adequacy of its search.  Def.'s Mot. at 6-8.  Plaintiff, however, did not challenge the adequacy of TIGTA's search in his opposition brief.  *See* Pl.'s Mot. at 14 (asserting that "there must be an adequate search" without further discussion of why TIGTA's search was inadequate).  Instead, he raised it for the first time in his reply brief in support of his cross-motion for summary judgment, *id.* at 10-17.  "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief."  *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011) (citation and internal quotation marks omitted); *see also McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair . . . , but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)).  The court therefore declines to consider Plaintiff's challenge and enters summary judgment in favor of TIGTA with respect to the adequacy of the search.

### D.   Privacy Act

Finally, TIGTA moves to dismiss Plaintiff's Privacy Act claim for failure to state a claim or, in the alternative, moves for summary judgment.  Def.'s Mot. at 3-5.  The Privacy Act provides that, unless authorized by the Act, "no agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b).  None of the three IRS Employees identified in Plaintiff's FOIA

request consented to the release of TIGTA's investigative files concerning their conduct. Accordingly, TIGTA properly withheld the records pursuant to the Privacy Act.

Plaintiff counters that TIGTA has mischaracterized his request and argues that his request pertained not to files about the three employees, but to files about him and his whistleblower activities.  Pl.'s Reply at 2-3.  Plaintiff points to TIGTA's Answer, which admitted that TIGTA had "conducted investigations pertaining to communications a counsel for Plaintiff had with Internal Revenue Service personnel."  *Id.* at 2 (citing Am. Answer, ECF No. 16, ¶ 5).  That admission does not, however, mean that the files at issue are about Plaintiff, rather than the IRS Employees.  Plaintiff's FOIA request was clearly focused on information concerning the IRS Employees.  His request sought "all information or investigative material that may have come to light as a result of a completed TIGTA investigation(s) regarding" the three IRS Employees and their interactions with Plaintiff's attorneys.  Tufts Decl., Ex. 22.  TIGTA's *in camera* declaration confirms that the responsive materials concern the IRS Employees.  *In Camera* Decl. ¶ 6.

It may be true that TIGTA's investigation of those employees arose out of Capes' contacts with the IRS and therefore the responsive documents likely in some way reference Plaintiff's counsel and his activities.  But, even if Plaintiff's counsel's actions could be imputed to him, that fact alone does not make those records "about" Plaintiff or prove that they "pertain" to him.  As the Court of Appeals observed in *Sussman*, when materials pertain to both a Privacy Act requester and a third party from whom consent has not been obtained, the Privacy Act's prohibition on disclosure "must take precedence."  494 F.2d at 1121 n. 9; *see also Mobley v. CIA*, 924 F. Supp. 2d 24, 57 (D.D.C. 2013).  Here, where Plaintiff has not obtained consent from any of the IRS Employees to whom the responsive records pertain, the records may not be disclosed.

## V.      CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part TIGTA's Cross-Motion for Summary Judgment.    The court denies Plaintiff's Cross-Motion for Summary Judgment.    Furthermore, in light of the court's holding with respect to the applicability of Exemption 6, Plaintiff's Motion for a Vaughn Index is denied, as well.

This matter is remanded to TIGTA to conduct a further segregability review and to disclose any reasonably segregable documents.  Such review shall focus particularly on records containing return or return information for taxpayers other than Plaintiff to which he might be entitled under 26 U.S.C. § 6103.  The court shall retain jurisdiction over this matter and directs TIGTA to submit a status report no later than April 25, 2016, setting forth the status of its segregability review. Alternatively, on or before that date, TIGTA may submit a "detailed justification" of its segregability determination and renew its motion for summary judgment.


Dated:  March 25, 2016

Amit P. Mehta
United States District Judge